Filed 12/9/14  P. v. Bolden CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY BOLDEN et al.,<br><br>    Defendant and Appellant. | D064172<br><br><br>(Super. Ct. Nos. SCS253433, SCS259351) |

APPEALS from judgments of the Superior Court of San Diego County, Ana L. Espana, Edward P. Allard, III, Judges.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant Anthony D. Bolden.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant Lukemond Muhammad.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne McGinnis and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In case No. SCS253433, a jury convicted Lukemond Muhammad and Anthony Bolden of two counts of robbery (Pen. Code,[1] § 211; counts 1 & 2), one count of burglary (§ 459; count 3), and one count of conspiracy to commit robbery (§ 182, subd. (a)(1); count 4). Bolden additionally admitted having a prior prison commitment conviction (§ 667.5, subd. (b)). In case No. SCS259351,[2] a jury convicted Muhammad of 22 counts of robbery (§ 211; counts 1, 2, 4-5, 11, 13, 15-16, 18-20, 22, 27, 29-30, 34-36, 38, 40-41 & 43) and 13 counts of burglary (§ 459; counts 3, 6, 12, 14, 17, 21, 23, 28, 31, 37, 39, 42 & 44).[3] The court sentenced Bolden to an aggregate term of seven years in state prison and Muhammad to an aggregate term of 26 years in state prison.

Bolden appeals, contending the court prejudicially erred in case No. SCS253433 by excluding certain third-party culpability evidence. He also requests we independently review the record of an in camera proceeding conducted under *Pitchess v. Superior Court*

---

[1] Further statutory references are also to the Penal Code unless otherwise indicated.

[2] This case was consolidated and consisted of the charges from case No. SCS259351, the charges from case No. SCS254457, and counts 7-17 from case No. SCS253433.

[3] The jury did not reach a verdict on nine other similar charges and the court declared a mistrial as to these charges. The court later dismissed the charges at the People's request.

(1974) 11 Cal.3d 531 (*Pitchess*) to determine whether the court erred in finding a police detective's personnel records contained no discoverable information.[4]

Muhammad separately appeals contending there is insufficient evidence to support his convictions for counts 28 through 31 in case No. SCS259351. He also contends there is insufficient evidence to support his convictions for counts 38 and 39 in the same case.

We have reviewed the record of the in camera *Pitchess* proceeding and conclude the court did not err in finding the detective's personnel records contained no discoverable information. We are unpersuaded by Bolden's and Muhammad's remaining contentions and, therefore, affirm the judgments.

BACKGROUND

I

*Case No. SCS253433*

Robbery of Footaction Store (All Counts)

*Prosecution Evidence*

Muhammad's wife drove Muhammad and Bolden in Bolden's Jaguar to a cul-de-sac near a mall in Chula Vista.[5] Muhammad and Bolden got out of the car and walked toward the mall.

---

[4] The Legislature essentially codified *Pitchess* in sections 832.5, 832.7, 832.8 and Evidence Code sections 1043 through 1047. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225, fn. 3 & 1226.)

[5] Muhammad's wife testified in exchange for a plea agreement allowing her to plead guilty to the charge of accessory after the fact with a sentence of time served up to 365 days.

3

They entered a Footaction store at the mall. Their faces were covered and they wore black hooded sweatshirts. Muhammad wore shorts. They had the store's assistant manager and a salesperson go to the back room. They had the assistant manager open the store's safe. The safe contained gift cards, which they took.

Meanwhile, Muhammad brought bags to the salesperson and directed her to get him some shoes, specifying a specific model. She got him some shoes and put them in the bags. Bolden then had the salesperson open the cash register while Muhammad had the assistant manager continue filling bags with shoes. Bolden grabbed approximately $727 to $737 from the register and he and Muhammad ran from the store carrying bags with shoes and money. The store's surveillance system captured the incident on video.

After waiting for approximately 30 minutes, Muhammad's wife spotted Muhammad and Bolden running from the mall carrying shopping bags. Bolden got into the backseat of the Jaguar and told Muhammad's wife to drive. Meanwhile, Muhammad ran across the street and went onto the rooftop of a house. Muhammad's wife tried to drive away, but police stopped her.

Bolden got out of the car and started walking away from the area at a fast pace. When a police officer spotted him and yelled for him to stop, he ran away. The officer chased Bolden, but was unable to catch him.

Police apprehended Muhammad and, subsequently, conducted an in-person lineup. Both the assistant manager and the salesperson identified him as one of the perpetrators based on his clothing. Although the salesperson never saw the other perpetrator's face,

4

she previously testified at the preliminary hearing Bolden's size and build were similar to the other perpetrator's.

*Defense Evidence*

Bolden's mother and sister-in-law testified Bolden visited his brother on the day of the robbery. Bolden's sister-in-law could not remember exactly when the visit occurred. Bolden's mother testified Bolden visited his brother for an hour and a half sometime during the daytime.

Ten days before the robbery, a police officer arrested a man who was sitting in the driver's seat of a burgundy Jaguar that had been reported stolen. The man said he bought it for $700 from a man named Kareem.

II

*Case No. SCS259351*

<u>Robbery of Sprint Store</u> (Counts 28 through 31)

Two tall, broad men, one wearing a red sweatshirt and one wearing a black sweatshirt and prescription-type glasses, entered a Sprint store. The man in the red sweatshirt held a gun. The men ordered the employees and customers to get down on the floor. They said, "This is a robbery. You know what this is. This is a robbery." The men demanded money from the register and iPhones. The store was sold out of iPhones; however, it had an operational display model, which the man in the black sweatshirt ripped from the display unit. The men took approximately $500 from the cash register and some accessories from the store's shelves and then ran out of the store. The store's surveillance camera captured the incident on video.

5

A police detective who responded to the call for assistance at the Sprint store checked the area for suspects on his way to the store. He found a red sweatshirt in the middle of a nearby street. The sweatshirt did not appear to have been run over or to have been lying there for long. Rather, it appeared to have been freshly placed there. DNA testing showed Muhammad was a possible major contributor to a DNA mixture found on the sweatshirt.

*Robbery of Chevron Gas Station Convenience Store* (Counts 38 and 39)

A lone employee was working at a Chevron gas station convenience store when a man entered the store. The man was approximately six feet tall and wore a black and red hooded sweatshirt, black shorts, and black shoes. The man's face was covered, but his eyes were exposed. The employee could tell the man was a light-skinned black man with light-colored eyes.

The man walked up to the register and lifted his shirt, revealing a gun in his waistband. The man had the employee give him money from the cash register and a specific brand of cigarettes, which the man put into a small vinyl bag. The man asked for the employee's cell phone and wallet. The employee handed over his cell phone, but did not have his wallet with him. The man returned the employee's cell phone and left. Before leaving, the man directed the employee to tell the police a "black-skinned" male had committed the robbery. The employee later identified Muhammad as the robber from a six-person photo array. The employee was 70 percent certain of his identification. The store's surveillance camera captured the incident on video.

6

In addition, a police detective who had interviewed Muhammad in connection with several other cases viewed the video and opined Muhammad was the perpetrator. She based her opinion on the perpetrator's size, build, height, weight, movement, and voice.

## DISCUSSION

### I

### *Bolden's Appeal*

#### A

#### *Pitchess Proceeding*

Before trial, Bolden moved under *Pitchess*, *supra*, 11 Cal.3d 531, for discovery of information in a police detective's personnel records. The court granted the motion, agreeing to review the detective's personnel records to determine whether they contained discoverable information related to acts of dishonesty. After conducting an in camera review, the court determined there was no discoverable information.

At Bolden's request, and with no objection by the People, we have independently reviewed the record of the *Pitchess* proceeding. (See, e.g., *People v. Hughes* (2002) 27 Cal.4th 287, 330.) We conclude the court did not err in finding there was no discoverable information in the detective's personnel records.[6]

---

[6]     The transcript of and the documents reviewed by the court in the *Pitchess* proceeding were not initially included in the appellate record in this case. Despite his request for our review of the *Pitchess* proceeding, Bolden did not take any steps to have the transcript and documents included in the record. (See Cal. Rules of Court, rule 8.324(b)-(c).) We exercised our discretion to augment the appellate record on our own

7

B

*Third-Party Culpability Evidence*

1

a

A couple of months after the Footaction robbery, Kareem Muhammad (Kareem) was extradited from Nevada when a warrant was issued for his arrest in connection with the Sprint store robbery.[7]  After providing him with the advisements required by *Miranda v. Arizona* (1966) 384 U.S. 436, four detectives interviewed him about the Sprint store robbery and other robberies they were investigating, including robberies of a hotel, two auto parts stores, a sandwich shop, a Cricket store, and a Verizon store.  (We grant the People's unopposed motion to augment the record with the interview transcript and related documents.)  Some of the robberies occurred in Chula Vista and some of the robberies occurred in other cities.

At one point, a detective encouraged Kareem to talk and work out a deal.  Kareem replied, "But then I'm scared to sit here and say — you have a serious case — you see what I'm sayin'?"  Two of detectives responded that they were all investigating serious

---

motion. (Cal. Rules of Court, rules 8.155(a)(1), 8.340(c).) "[T]he failure of counsel to perfect the record delays the processing of cases and wastes judicial resources. Accordingly, we urge appellate counsel to ensure that the record is properly perfected in cases in which a *Pitchess* claim is raised." (*People v. Rodriguez* (2011) 193 Cal.App.4th 360, 366.)

[7]     We use Kareem's first name for clarity.  Kareem's surname is usually spelled "Muhammad," but is also sometimes spelled "Mohammad" in the record.  We are unable to resolve the discrepancy.  There is no indication in the record Kareem is related to appellant Muhammad.

cases. Kareem then clarified, "No no no! The two kidnapping ones is the ones that I'm talking about." One detective replied, "They [referring to the other detectives] all have kidnapping ones." (Some capitalization and punctuation altered.)

Later in the interview, the detective investigating the Sprint store robbery confronted Kareem about the evidence tying Kareem to the robberies. The detective asked Kareem about a specific phone call and Kareem said, "I don't know if I can talk about these kidnapping cases, though, man." Kareem then talked back and forth with detectives about whether kidnapping had been charged in the various cases they were investigating.

The detective investigating the Sprint store robbery then told Kareem, "[W]e're giving you the opportunity to apologize to [the victims]." The detective explained, "Okay? These, these people are scared, okay? The, the young man from the Sprint store? . . . He still has nightmares about that. Okay? What I'd like to do, Kareem, is go back to [him] and say, 'Hey, you know what? I talked to the guy. He's sorry.' But I got to hear that from you. I can't say that right now. Because you're not even owning up to anything. Okay? [The detective investigating the Cricket store robbery] wants to go to those two girls from the Cricket store and go, 'Hey, you know what? He's sorry.' Okay? [The detective investigating the other robberies]'s got victims that they want to hear that you're sorry, bud. Okay? There's reasons behind what we do. But like I told you from the get-go, what makes us men is how we deal with our problems. Okay, running away from it and banging your head on the table and putting on [Muhammad], okay." (Some

9

capitalization and grammar altered.) Kareem continued to deny any involvement in the robberies.

b

Before trial, Bolden's defense counsel filed an in limine motion seeking admission of one of Kareem's statements to detectives regarding his unwillingness to admit to cases with kidnapping charges. More particularly, defense counsel sought admission of the statement as it was paraphrased in a police report: "[Kareem] stated he was afraid to admit to the Chula Vista robberies that included kidnapping charges." (Some capitalization omitted.) Defense counsel argued: (1) the statement necessarily referenced the Footaction robbery because it was the only case the detectives were investigating that had a kidnapping charge, (2) the statement was admissible as evidence of third-party culpability, and (3) the statement was not hearsay because it was not offered for the truth of the matter or, alternatively, it fell within the hearsay exception for a declaration against interest.

The court tentatively ruled the statement was admissible, but the court noted the statement was contained in a summary from a police report. The court indicated it wanted to know exactly what Kareem said before it made its final ruling. Defense counsel informed the court he had seen a video of the interview, but he did not plan on making a transcript of the interview. The court responded that any additional information would be helpful.

Four days later, in the midst of trial, defense counsel informed the court he planned to admit the statement through the testimony of a detective present during the

interview.  The prosecutor requested the court reconsider its earlier ruling, arguing the statement was inadmissible under the hearsay rule and under Evidence Code section 352. After some discussion, the court continued further consideration of the matter to a later date and time.

Before the subsequent hearing on the matter, the prosecutor e-mailed the court and defense counsel a partial transcript of Kareem's interview.  At the subsequent hearing, the court noted it had received and reviewed the pertinent portions of the DVD of the interview and the partial transcript of the interview.  The court found the statement did not relate to the Footaction robbery and explained, "[W]hen you look now at the total transcript and put it in context, I don't see anything here in this statement . . . that is relevant at all in this case."  The court also found the evidence was inadmissible under Evidence Code section 352.  The court, therefore, denied the motion to admit the statement.

2

Bolden contends the court erred in excluding evidence of the statement because the evidence was relevant and was not substantially more prejudicial than probative under Evidence Code section 352.  Bolden further contends the error requires reversal of his convictions because it negatively impacted his constitutional right to present a complete defense.

Third-party culpability evidence is admissible if the evidence is capable of raising a reasonable doubt as to defendant's guilt.  (*People v. Page* (2008) 44 Cal.4th 1, 38; *People v. Hall* (1986) 41 Cal.3d 826, 833.)  The evidence " ' "must link the third person

11

either directly or circumstantially to the actual perpetration of the crime.  In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." '  [Citation.]"  (*People v. Edwards* (2013) 57 Cal.4th 658, 729.)  We review the court's ruling on the admissibility of third-party culpability evidence for abuse of discretion.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

In this case, Kareem's statement did not tend to connect him to the Footaction store robbery because he did not make the statement during a discussion of the Footaction store robbery.  Rather, he made it during a discussion of other robberies.  The statement was, therefore, irrelevant to any of the charges against Bolden.  Because of the statement's irrelevancy and the context in which it occurred, its admission would have unnecessarily consumed trial time and confused the issues before Bolden's jury with issues involving other crimes and cases.  Accordingly, Bolden has not established the court abused its discretion in excluding the evidence.

Moreover, as Bolden acknowledges, excluding evidence of Kareem's statement did not deprive Bolden of an opportunity to present a third-party culpability defense.  The court merely rejected certain evidence concerning the defense.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *People v. Adams* (2004) 115 Cal.App.4th 243, 255.)  Bolden was still able to present his defense through alibi evidence and through evidence: (1) Kareem had access to Bolden's Jaguar while Bolden was incarcerated on another matter, (2) Kareem fraudulently sold the Jaguar to an unwary buyer after it was falsely

reported stolen, (3) Kareem's cell phone was found in the Jaguar, and (4) Kareem was connected to Muhammad in various ways.

Further, "the application of the ordinary rules of evidence under state law do[es] not violate a criminal defendant's federal constitutional right to present a defense, because trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial." (*People v. Abilez* (2007) 41 Cal.4th 472, 503; accord, *Clark v. Arizona* (2006) 548 U.S. 735, 770 [a defendant's due process right to introduce relevant evidence may be curtailed for good reason].) "While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326.) The ability of a trial court to exclude evidence for good reason specifically applies to "the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." (*Id*. at p. 327.) Since the court properly excluded the evidence of Kareem's statements, the court did not deprive Bolden of his due process right to present a third-party culpability defense. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1243 [absent an abuse of discretion, exclusion of third party culpability evidence does not impermissibly infringe on a defendant's federal constitutional rights].)

II

*Muhammad's Appeal*

A

*Sufficiency of Evidence for Sprint Store Robbery*

Muhammad contends there is insufficient evidence to support his convictions for Counts 29 through 31 involving the Sprint store robbery. In evaluating Muhammad's claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] . . . A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

As to these counts, witnesses testified a man wearing a red sweatshirt and a man wearing a black sweatshirt committed the robbery. The jury also saw still images from the store's camera showing the robbery, the robbers, and the robbers' clothing. Shortly after the robbery, police found a red sweatshirt lying on a nearby street. The sweatshirt appeared to have been freshly placed there and Muhammad was a possible major contributor to a DNA mixture found on it. Muhammad wore a red sweatshirt in two

14

other prior robberies for which the jury received evidence and convicted him, but which are not being challenged in this appeal—the robbery of an auto parts store and the robbery of gas station convenience store.  The jury could have reasonably inferred from this evidence, Muhammad was the Sprint store robber wearing the red sweatshirt.

B

*Sufficiency of Evidence for Chevron Gas Station Convenience Store Robbery*

Muhammad also contends there was insufficient evidence to support his convictions in counts 38 and 39 involving the Chevron gas station convenience store robbery.  We apply the same standard of review discussed in part II.A., *ante*.

As to these counts, the store's cashier identified Muhammad as the robber from a six-person photo array with 70 percent certainty.  The jury also viewed a surveillance video of the robbery, allowing the jury to hear the robber's voice and observe his appearance and demeanor.  In addition, a police detective who had previously interacted with Muhammad viewed the video and opined the robber shown in the video was Muhammad "based [on] his size, build, height, weight, . . . the way he moved, and also his voice."  Although the store cashier did not identify Muhammad in court, the cashier's description of the robber—a six foot tall light-skinned black man with light-colored eyes—matched Muhammad's description.  The jury could have reasonably inferred from this evidence Muhammad was the perpetrator of the Chevron gas station convenience store robbery.  (*In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1497 [when the circumstances of an eyewitness identification and its weight are explored at trial and the trier of fact believes the eyewitness identification, the trier of fact's determination is

15

binding on the reviewing court]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 278 [where jury heard conflicting evidence regarding identification, including an eyewitness who was 90 percent sure of identification, and jury determined defendant was guilty beyond a reasonable doubt, evidence was sufficient as a matter of law].)

## DISPOSITION

The judgments are affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

AARON, J.

16